# GONZALES *v.* UNITED STATES.

HOMICIDE; INSANITY; JUDICIAL DISCRETION; APPEAL AND ERROR.

The discretion given trial judges in criminal cases by sec. 927, Code, D. C.
[31 Stat. at L. 1340, chap. 854] which provides that if after ver-
dict of guilty, prima facie evidence is submitted that the accused
is then insane, the court may cause a jury to be impaneled to in-
quire into his sanity, and, if found insane, he is to be confined in
the hospital for the insane, is not abused so as to warrant re-
versal by a denial of an application for an inquiry under the
statute by one who has been convicted of murder notwithstanding
his defense of insanity, where the application is based upon affi-
davits of the prisoner's sanity, made by persons who are not ex-
perts, one having been a witness at the trial, and containing no
recitals of facts on which their opinions were based; and letters of
the superintendent of the hospital for the insane, which, while ad-
mitting that the majority of the hospital staff thought the prisoner
was malingering, stated that this was true only to a limited extent,
and showed nothing more than that the prisoner, who had once before
had "prison psychosis," from which he rapidly recovered when the
cause of immediate apprehension had been removed, had, to escape
the consequences of his present conviction, had a second attack
which "in all probability would disappear very rapidly if the causes
of its existence were removed."

No. 2514. Submitted May 6, 1913. Decided May 26, 1913.

HEARING on an appeal by the defendant from an order of the
Supreme Court of the District of Columbia, dismissing his
petition for an inquisition into his sanity.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

Andrew Gonzales, appellant, was charged in an indictment
with the murder of his wife on July 21, 1911, and brought to
trial in July, 1912. His defense was insanity at the time of
the commission of the crime. On July 12 the jury returned a

verdict finding the defendant guilty of murder in the first degree, and he was sentenced to be hanged on September 13, 1912. The date of execution was postponed from time to time until January 27, 1913. January 17 he filed a petition in the criminal court, alleging "that he is now and was at the time of his said crime of unsound mind." The prayers were that the sanity of petitioner be inquired into as provided by statute; and that the "finding of said inquiry may antedate the 21st day of July, 1911." The following affidavits were filed in support of the petition:

I, Augusta Holt Kelly, do affirm and say that I am acquainted with Andrew Gonzales, the defendant in the above-entitled cause, and have known him since he has been confined in the District jail. I have had occasion to see the said Andrew Gonzales while he has been incarcerated at least once a week, and had several conversations with him, and have observed his actions, and from said observations and conversations, I believe him to be of unsound mind. I have had some considerable experience with insane persons and have observed their actions and conduct.

Augusta Holt Kelly.

I, John R. Roberts, being first duly sworn, depose and say that I am acquainted with Andrew Gonzales, the defendant in the above case, having known him since his incarceration in the District jail for the killing of his wife, having seen him once every week and sometimes twice; that I have talked with him and observed him, and from said talk and observation I am of the opinion that the said Gonzales is now and was at the time of the killing of said wife, of unsound mind; that I have been visiting the District jail for about thirty-five years as a Christian missionary, and during that time I have seen many persons who were insane persons, and observed their actions: I reside at No. 35 Pierce street, N. W., Washington, D. C.

John Roberts.

The following letters from Dr. Wm. A. White, superintendent of the Government Hospital for the Insane, addressed to the Attorney General, were also attached to the petition.

Washington, D. C., December 14, 1912.

In re Andrew Gonzales, Colored, D. C. Prisoner.

To the Attorney General, Department of Justice,
    Washington, D. C.

Sir:—

In response to a telephone communication from the pardon attorney yesterday morning, I am sending you herewith a report of our observations as to the mental condition of D. C. Prisoner Andrew Gonzales, and such other matters as were requested.

It is my opinion that Gonzales is at present insane, suffering from a prison psychosis, such psychosis being essentially a reaction to the situation in which he finds himself, and calculated to defend him from its realization. This diagnosis is corroborated by the description of the psychosis which he had at Dannemora, which was also evidently a reaction of the same type. This diagnosis is not inconsistent with definite efforts at malingering with which those who have previously examined him were impressed.

As to the question whether he was responsible at the time of the murder, the hospital is practically without evidence bearing upon that point, except that one of the members of the staff, Dr. J. C. Hassell, served at Auburn State Prison, and knew Gonzales as a prisoner there previous to any suspicion of mental disease having arisen, and he remembers distinctly Gonzales's threats to kill his wife when he got out of prison.

There should be taken into consideration, however, with these facts, the further fact that Gonzales is apparently of a very defective and unstable makeup. While this is verified by what we know of his past history, it could be predicted by the

type of psychosis from which he now suffers, and from which he evidently suffered at Dannemora.

I would further add that the case is by no means a simple one, but one about which men of wide experience might very well differ.

Very respectfully,

Wm. A. White,<br>Superintendent.

Washington, D. C., January 5, 1913.

In re Andrew Gonzales, Col., U. S. Prisoner.

To the Honorable the Attorney General, Department of Justice, Washington, D. C.

Sir:—

In response to the telephone request of the pardon attorney, I am sending herewith inclosed a copy of the summary of the case of Andrew Gonzales, together with a copy of the notes made upon his case since such summary was completed.

My opinion regarding this man has not changed materially since my letter to you of December 14th, in which I stated I believed him to be suffering from a prison psychosis, and explained therein, in a general way, what I meant by that term. In order now, however, that you may have the whole matter before, you, I will again enter at some further length into the questions involved.

In the first place, the whole question of the prison psychosis is a new one in this country, and in so far as I know had never been formally offered as an explanation of abnormal conduct until the case of Mattie Lomax, upon which I reported some time since. The whole matter has been rather exhaustively studied in Europe, but we have only begun to take up its study in this country, and at this hospital we have been pioneers. The prison psychoses develop in prisoners either awaiting indictment, or awaiting trial, or during trial, or after sentence,

as a defense from a realization of the situation in which they find themselves. This is exactly what has happened in the Gonzales case, particularly with reference to his delusion that he is Jesus Christ. This is well shown in a letter which he wrote, in which he stated that Jesus Christ cannot be hung. He never called attention to this statement; he never mentioned his belief that Christ could not be hung, and it was only by looking over all of the available matter that this statement was found. It contains, as you will see, a full explanation of why Gonzales, so to speak, wishes to think that he is Christ, because if he is Christ he cannot be hung.

Now, it must be said that this whole reaction in this case is an extremely shallow one,—that Gonzales' knowledge of the crime of which he is convicted and his realization of the situation in which he is lies only a little bit beneath the surface, and at times it forces itself upon his attention in spite of his defensive efforts, and so we see in some of the later notes of the case his plots to escape and expression which show a very complete realization of the trouble he is in. This merely means that his defenses are weak and that from time to time they break down.

At the conference which the staff had with regard to this prisoner the majority of the opinions were that he was malingering. As for myself, however, I do not think the theory of malingering by any means explains the situation. I have no doubt that Gonzales does malinger to a certain extent; at least, I have no doubt that he is willing to accept these false ideas that are protective, but I think that this reaction is a pathological one. It must be remembered, however, that such a pathological reaction would not be expected in any one but a more or less distinctly abnormal individual and all of Gonzales' history indicate that he is such an individual. He had a previous attack of mental disturbance while in prison, which let up very shortly after being sent to Dannemora, and in all probability this present disturbance would all disappear very rapidly if the causes for its existence were removed.

As to the whole question of responsibility, I can only say

that we have no evidence to indicate that Gonzales had any psychosis at the time he committed the homicide, and that the whole picture indicates that the delusions have been developed following that event. However, they bespeak an abnormal character, which, of course, he must have had at the time of the homicide. This type of abnormal character is common among criminals; in fact, it is the very thing that makes them criminals. On the other hand, this kind of reaction with which they endeavor to escape from the consequences of their acts is also quite common and it is a result of the act absolutely.

So far as I know, the legal questions involved in such a situation have never been passed upon. Of course, they have nominally, but I do not believe with a full realization of what the whole thing means. The whole problem, therefore, becomes a very distinctively individual one, and I can only outline its various component parts and trust that by doing so I may be of some assistance.

Respectfully yours,

Wm. A. White, Superintendent.

The Court denied the petition, and from that order this appeal has been prosecuted.

*Mr. Charles H. Hemans* and *Mr. George F. Collins* for the appellant.

*Mr. Clarence R. Wilson,* United States Attorney for the District of Columbia, for the United States.

*Mr. J. M. Proctor* also for the United States.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

In the courts of the common law, if a suggestion of insanity was made after conviction and before sentence, it was the

practice of the trial judge to take such action upon the suggestion as, in his discretion, he should deem best. It is an appeal to the humanity of the court to postpone the punishment until a recovery should take place; and he may hear the evidence, or call in a jury to pass upon it. *Nobles* v. *Georgia,* 168 U. S. 398–407, 42 L. ed. 515–518, 18 Sup. Ct. Rep. 87.

The procedure in such cases in this District is prescribed by the Code (sec. 927 [31 Stat. at L. 1340, chap. 854]), which provides that if, before trial or "after a verdict of guilty, prima facie evidence is submitted to the court that the accused is then insane, the court may cause a jury to be impaneled . . . to inquire into the insanity of the accused, and said inquiry shall be conducted in the presence and under the direction of the court." If the jury find insanity, the convict is to be confined in the hospital for the insane. Whether a prima facie case has been made by the petitioner requiring submission of the issue to a jury is a question submitted to the sound discretion of the trial judge. If it were not so, if the court be compelled to grant an inquiry by jury as an absolute right of the convict upon any showing, a practice would be instituted productive of delay, and otherwise inconsistent with the due administration of justice. Every convict might avail himself of the right, repeating petitions interminably. The matter is wisely left to the sound discretion of the trial judge. Having conducted the trial through its various stages, he has had the opportunity to observe the accused, and he is ordinarily acquainted with the witnesses whose affidavits are produced in support of the petition. If a real doubt be raised as to the sanity of the petitioner, it may be presumed that the judge will give him the desired hearing by a jury. As in respect of other matters within the discretion of a trial court, its exercise will not lightly be disturbed. The two affidavits quoted above were made by persons who are not experts, and contain no recitals of facts and circumstances coming within their observation on which an opinion can be founded. Notwithstanding the fact that the trial jury had found the accused sane at the time of the commission of the offense,—that being his defense,—one of the affiants expresses

the opinion that he was insane then and has so remained. The other had been a witness as to his insanity on that trial. The affidavits are entitled to no weight. The letters of the superintendent of the hospital for the insane are chiefly relied on as making a prima facie case. It is to be inferred that these were written pending an application for reprieve or pardon; but it does not appear upon what observation they were founded. Assuming, however, that they may have been founded upon a report of the evidence on the trial, relating to the mental condition of the accused, as well as upon observation of his actions since conviction, we are of the opinion that they are not sufficient to require an inquiry by jury into the present mental state of the petitioner. The opinion is expressed that the petitioner is suffering from prison psychosis,—a newly discovered type or phase of insanity which is described as "essentially a reaction to the situation in which he finds himself, from its realization." The diagnosis, it is admitted, "is not inconsistent with definite efforts at malingering with which those who have previously examined him were impressed." In the second and more elaborate comment on the case, it is said that the "whole reaction is an extremely shallow one,—that Gonzales's knowledge of the crime of which he is convicted and his realization of the situation in which he is lies only a little bit beneath the surface, and at times it forces itself upon his attention in spite of his defensive efforts, and so we see in some of the later notes of his case his plots to escape and expressions which show a very complete realization of the trouble he is in. This merely means that his defenses are weak and that from time to time they break down." The majority of the hospital staff with whom the superintendent conferred expressed the opinion that the case was one of malingering; but the superintendent, who said he had no doubt that he malingered to a certain extent, notwithstanding thinks the theory of malingering does not explain the situation. He also says that a previous attack of mental disturbance let up very shortly after he had been sent to Dannemora. This evidently refers to a former conviction in some other jurisdiction, after which he had been

committed to an insane asylum. And he adds that "in all probability this present disturbance would all disappear very rapidly if the causes for its existence were removed." The foundation for the theory is that the "pathological reaction" would not be expected in anyone but a "more or less distinctly abnormal individual," and that petitioner is an abnormal individual, else he would not have committed the homicide, because the abnormal character is what makes the criminal. It is a frequently expressed opinion that all crime is insanity; nevertheless such general insanity does not exempt one from the consequences of the criminal act. The practical test of the law is whether, notwithstanding his abnormal character, he was capable of distinguishing between right and wrong,—of realizing what is right and what is wrong, and doing the one and refraining from doing the other.

All that these letters show is that a person who has been found by a jury to have been sane when he committed the crime, and who has once before had "prison psychosis" from which he rapidly recovered when the cause of immediate apprehension had been removed, has, to escape the consequences of his last conviction, had a second attack, which "in all probability would disappear very rapidly if the causes of its existence were removed." We agree thoroughly with the learned trial judge, who said, in denying the petition: "What would be the result in any case, almost, where a man has committed a murder and is sentenced to be hanged, and knows that if he appears sufficiently terrified and peculiar, and shows sufficient signs of being crazy because he is going to be hanged, that he will not be hanged? How many cases would there be where they would not have prison psychosis?"

There was no error in holding that a prima facie case had not been presented requiring that submission of the prisoner's mental state to inquiry by a jury, and the judgment is affirmed.

*Affirmed.*